Good morning. John Ballas on behalf of the defendant, Arnold Flowers. I'm intending to reserve two minutes for rebuttal. Please watch the clock. I'm going to start with the second issue in my briefs, which is the District Court erred in admitting evidence of a shooting outside Mr. Flowers' home in March 2016, where there was no evidence linking the shooting to any drug activity or any firearms, the charges in this case. Mr. Flowers, in a pretrial motion, objected to the evidence as irrelevant, as propensity evidence under Rule 404B, and also under Rule 403 on the ground that the probative value was substantially outweighed by its prejudice. I can imagine a 403 argument. I do not understand the 404 argument. So the 404B argument is essentially that the government is presenting this evidence to show that Mr. Flowers was involved in drug dealing in the past. Okay, but there's no allegation Mr. Flowers, he was a victim on that occasion, right? Somebody came and shot up his car. Yes, but the government argued that they shot at his car because of prior drug dealing. Just because he was in that milieu, is that the idea? Okay. It just doesn't strike me as terribly probative or prejudicial. Well, it's pretty weak evidence of any kind of drug dealing. That's basically our argument, is that it's practically irrelevant because there was no evidence of the reason behind the shooting. Right, but that's the problem I have with 404 to the extent I can even really make a 404 argument, propensity argument. 404B as well as 403, because it would have to be unfairly prejudicial. It was just going to really swing. The reason it was, I mean, the reason it's 404B is somewhat related to the relevance argument is that the government used it to actually argue that that was evidence that he was actually dealing drugs in the past. Wasn't the government's argument that it was probative of why he would have firearms? Yes, they argue that, but in the context that because he was a drug dealer, he would have had firearms because it was a dangerous business. But how is it terribly? There's another individual living in the home that the jury surely heard testimony about, Devon Smith, and certainly questions about whether he was dealing. We don't know who the target was of the shooting. I'm just not really sure it reflected all that poorly on your client at all. Well, I think in this case the evidence wasn't extremely strong. The jury acquitted on count two that the guns were connected in furtherance of the drugs. The firearms were actually in a locked safe. And the argument by the prosecutor was both in its initial closing as well as rebuttal. And the question is, is whether or not it would have influenced, had any influence on the jury's verdict. And we argue that because the government did emphasize it a couple of times in an overall closed case, that it may have influenced the verdict and he should get a new trial. Counsel, I don't want to use your time or redirect you in a different way, but the part that I'm most interested in this case is, excuse me, is the argument about the enhancement for maintaining the house. Yes. And that's actually what was going to – I'm moving to that one next. Okay. And that was the one that the district court actually said was a closer question. And basically the government has to prove that the defendant, to apply the enhancement, maintain the premises for the purpose of manufacturing or distributing a controlled substance. They moved into the house, the Flowers house, about 11 or 12 days before the search. So they had – there was evidence that the jury heard about the active drug use of the Larkspur residence. Is that right, that there were the short visits, the Evan Smith activity? There was evidence of a number of visitors for short periods of time, no evidence of what they were there for. And there was evidence that Devon Smith was involved in at least two separate heroin transactions in January and February. So one and two months before. So I was inferring that the officers got a search warrant for the Larkspur residence and then when everyone, all of the inhabitants moved to Seclusion Bay, they dropped the Larkspur search warrant and then assumed that the business was moving to Seclusion Bay. I think that's accurate. I think they actually – there's some evidence in the record that they were attempting to get a search warrant for the Larkspur. They also were getting, of course, a search warrant for the storage locker. Storage lockers. And the commentary says that for the enhancement to apply, that the manufacturing and distributing of controlled substance need not be the sole purpose of the premises but must be one of the defendant's primary or principal uses for the premises rather than an incidental or collateral use. Our argument is essentially that this was the Flowers family home. He lived there with his wife, his children. And the drug dealer. Okay. And Devon Smith on the – yes. So one question I had, this was as I was looking through the timeline, after the move to Seclusion Bay, it seems that there was some evidence that Flowers picked up something. Adair was trying – Detective Adair was trying to use a source and Flowers picked up something at the storage facility, returned to Seclusion Bay, and then Mr. Smith left Seclusion Bay five minutes later and made – drove somewhere, made a stop, drove another place, made a stop. And so the inference that the government made was that Mr. Smith was getting resupplied and this was after the move from – to Seclusion Bay. Am I reading that timeline wrong? Is that correct? That all happened after the move? I don't remember that one in particular. I know there was a time on March 8th, which would have been before the – This was March 22nd. So March 22nd – So he says Detective Adair saw Flowers' vehicle at the storage facility, then Flowers returned to Seclusion Bay, and then immediately thereafter Smith left Seclusion Bay and did drives consistent with drug dealing, and then returned to Seclusion Bay, according to the record that I saw. The government's brief. So I don't remember that, but if it was March 22nd, that would have been after the move to Seclusion Bay, because the Seclusion Bay move, there was evidence of a U-Haul going to the Seclusion Bay house on March 17th and March 18th. And so our argument is essentially that it's more of an incidental rather than a primary or principal purpose of the residence to store drugs for distribution. And I will reserve my remaining two minutes for rebuttal. All right. Thank you. May it please the Court. Elizabeth Dinello for the United States. First, just quickly to answer your question about the March 22nd activity that was after the family had moved to Seclusion Bay. Turning back to the question of the admission of the March 7th shooting, district court did not abuse its discretion in admitting that evidence. Evidence that Flowers had been the victim of a drive-by shooting three weeks before execution of the search warrant was admissible to explain why he would possess drugs, why he would possess guns in the house. The expert had testified that drug trafficking is a dangerous business, and that's indeed how the prosecutor argued this evidence, to explain that because drug trafficking is dangerous, as evidenced by this shooting, that's why drug traffickers need to possess firearms, and that's why this drug trafficker needed to possess firearms. Can we go back to the enhancement? Yes. I'm troubled by the enhancement. I think for some of the reasons that have been expressed. There's the Larkspur activity, right, in and out, a lot of complaints about what looks like drug activity, but then they moved and they hadn't been there very long at all. Only 10 days. Right, and so there isn't the same in and out activity at that place, and I think the district court very conscientiously recognized this is a very close call, and the government's got the burden, and so, you know, that's why I'm focusing on it, speaking for myself. And there's this other sort of theme about these safes being carried back and forth, and what we have is that the safes, I think, were opened up, and the safes, according to the government's witnesses, smelled like cocaine. Is it cocaine? One of the safes did, yes. Okay. And back and forth, and there's testament, I think, from Booker that he peeked in the safe when it was open, and he saw several things, including some powder. Was that peeking in that transcript, that portion of the transcript, is he talking about the safe being opened in the storage container, storage facility? It's not clear from his testimony where he was when he was peeking. Uh-huh. But if I can answer your larger concern about the justification for the stash house enhancement. Well, it seems to me that we're talking about storage. Is that the government's theory, or are you talking about dealing? Storage, primarily. Okay, I'm listening. And the seclusion bay house, and that's the house we're talking about at this point, was where the drugs were found, six one-ounce balls of cocaine. It's where the safes were found, the safes that contained the guns, the cash, and the smell of cocaine in one of them. Right. But the safes went back and forth, counsel. I'm trying to figure out where his operation really stored stuff and where it was dealing. And given that they were on this house a short time, I think the district court is right to say this is a close call. So what's your best shot? I think what tips it over, Your Honor, is the packaging material. Because in the bedroom, which is steps away from where the drugs are recovered, and the same bedroom where the safes are found, are the plastic bags. One has the corner torn off, which the expert explains is how small packages of drugs are packaged. And the packaging material is found in the dresser drawer, which smells of cocaine. There's also the smell of cocaine in the safe. And notable, too, that the dresser, excuse me, also contains the weight for the scale. But there's no question the house was used as the family residence. But in the kitchen of this family residence, the heart of any family home, that's where the scale is found in a mug with additional packaging material. So I recognize your Court's concern about the safes going back and forth. But the addition of the packaging material and the standard of proof here was only preponderance of the evidence. And although the district court rightly took this very – looked at this very carefully, there was sufficient evidence to support the enhancement. Did the two points – forgive me. Go ahead. Did the two points change the guidelines, change the outcome? They changed the guideline range, although the district court at sentencing – and this is at page 74 of the sentencing transcript – says – departs upward from the guideline range and makes clear that it did not find that a sentence within the guidelines would be sufficient under the various 3553A factors. I think I interrupted you. I agree that it's – the only thing here that might make the distribution enhancement work is the packaging, the paraphernalia-related. My questions are, first off, is it significant that those materials are normal household items? And secondly, from a district court's perspective, the base offense level really should represent kind of the heartland of cases. And then the enhancements are there for mitigating or enhancing purposes. And this seems to me, with just drugs and household items, to still be kind of in the heartland of cases that most district courts deal with when people are convicted of possession with intent to distribute. And so this is more a question of principle. What really makes this case an enhancement case? There's no question that we're not manufacturing. There's no question there's no drug distribution evidence in the record. Smith didn't even have drugs in the area that he routinely occupied. And he's the only one out there looking like he's distributing substances. So why is this outside the heartland for purposes of enhancement? First, to answer your point about these being household items, one normally doesn't keep packaging material in one's dresser drawer that also smells of cocaine. So this is more than simply Ziplocs in the kitchen drawer. These are Ziplocs in the bedroom close to where the cocaine is stored, an unusual spot to be storing Ziploc bags and the smell, which indicates what they were used for, and also the torn bag, which the expert explains the significance of that. But to your point about why isn't this in the heartland of cases, the guideline says that this enhancement, it's appropriate to apply this enhancement if one of the As long as it's not incidental, it's appropriate to apply the enhancement. And it wasn't incidental here. When the evidence shows that this was an ongoing drug operation, this wasn't just, please come in one day, there are the drugs, that's it. The evidence showed that this had been going on for some time. And that's shown, for example, by the visits to and from the storage unit. It's shown, for example, by the text messages going back to March 7th. It's shown by the sheer amount of money involved. I think that's all right. I think that's all correct. And that explains the convictions for sure. But I'm really focused on this enhancement about maintaining the house. Is that nonresponsive? I don't mean to take you afield from answering Judge Friedenthal's question. No, and perhaps I wasn't answering your concern enough or Judge Friedenthal's concern, that the evidence that it was an ongoing drug operation supports the notion that the house is the base of this drug operation. That it's not simply that. Why is that? Why couldn't we equally draw the conclusion, after all it is the government's burden, to see that the storage unit is the common denominator and that Devon Smith is dealing out of the red car? I agree there's ample evidence of an ongoing operation. I'm trying to figure out why the two-point enhancement is appropriate for maintaining the home. Because drug dealers have to live somewhere, too. He's going to have the home as one purpose, and we have to figure out what the primary purpose is. Well, one, there's evidence that the home itself was used as a base of operations, given Nyree Booker's testimony about seeing the safes in the house. So it wasn't the one. But he went back and forth, and he saw them in the storage unit, right? Right. And I'm not so I'm not sure why they were going back and forth, but to me that suggests there's a reason to take them out of the house. He's storing it elsewhere. Otherwise, why would he take it out of there? Well, the evidence, there was evidence at trial that the reason he took it out of the storage unit was that the woman with whom he was romantically involved at the storage unit, they'd had a fight, and the inference was that he was afraid she might because she had access to the storage unit. But there were other times, weren't there? But they went back and forth. To Judge Akuta's point, it wasn't just one time they decided to vacate the unit when she got mad at him. So he kept the safes in the house some of the time, and some of the time they were in the storage unit. And I think if I really sort of two ways to answer your question. First of all, forgive me, but isn't Judge Akuta right, for starters, that he sometimes kept the safes in the house and sometimes kept them in the storage unit, or do we misunderstand that part? No, you're correct in that. The safes moved back and forth. But the fact that the safes were sometimes kept at the storage unit doesn't preclude the fact that the house, one of the primary purposes of the house, was as a base for drug operation. They're not mutually exclusive, that when the safes are at the storage unit, that's where the whole enterprise is centered. When the safes are at the house, that's where the whole enterprise is centered. But moreover, there's no evidence of any packaging at the storage unit. And it doesn't make sense that there would be packaging at the storage unit, because that's something for which you need privacy, for which you need security, where people can't watch you, people can't come and take your stuff as you're packaging it. And the fact that there was packaging material in the house so close to where the drugs were stored does sustain the government's burden, which, as you point out, is on the government, by a preponderance to justify the enhancement. I think it does, absolutely. And I think this is probably what Judge Gleeson was getting at, and that we're all getting at. It is certainly, we've got evidence of an ongoing drug operation, and we've got certainly ample evidence that the drugs were found at this residence. So this is part of it. We're trying to focus in, laser in, on more than an incidental use, given that he clearly went back and forth and had the safes in the storage unit for some part of the time. So can you tell me, what is your best shot at just meeting that burden, that the house was really a primary purpose, and more than an incidental use? Forgive me, because I'm going to call it a combination rather than a single fact. That's okay. The combination of the fact that this is an ongoing enterprise, which, as you note, the evidence supports that inference, an ongoing enterprise with substantial evidence found in the house that includes evidence of packaging of drugs. Okay. So that's the packaging you're relying on. The packaging, I think, tips it over, but it's not by any means the sole. So just one quick related question. Weren't there two scales in the house? No. There were scale weights in the bedroom drawer. The scale itself was in the kitchen. Thank you. I'm over my time. Unless the Court has any further questions, we'd ask you to affirm the judgments of the District Court. Thank you. Thank you. Thank you. Just briefly, it would affect the guideline score because the Group 1 guideline would go down from 20 to 18, and depending on the grouping rules, it would either make a difference of one or two levels. And the fact that the District Court departed upward is not determinative here. If the guideline range, of course, was lower and she did the same degree of a departure upward a few months, she should still get a – he very well may still get a lower sentence. And the Supreme Court law is generally that when there's a guideline error, unless the District Court makes a clear statement that would impose the same sentence, that the error should go back for a re-sentence. What's your response to the government's argument that there was no packaging material found in the storage area, all the packaging material was found at the house, indicating that any packaging or – for distribution was done at the house, and that that's a – along with the other evidence is a key factor indicating that at least one primary purpose of the house was for the drug distribution business? I think Nyree Booker did say that he saw baggies and a baggie with white powder in the storage locker, and the – Do you know where that is in the record? That is in the record. Do you know where that is in the record? It's in my brief. Okay. And then my other point would be, while I'm looking at this, would be that it did appear that Mr. Flowers had a relationship with a woman at the storage locker, at the storage facility, and then abruptly took things out of the storage locker. And so I think the evidence from the search warrants, et cetera, was that if there was drug dealing going on, it was primarily out of the storage locker, and then the items were just temporarily – the safes were brought over for a short period of time. It doesn't show that that principle of primary purpose of the house – Okay. You're over your time. Do you want to wrap up? Yes. That's all I have. I was just going to – maybe I can file something with where in the record Nyree Booker's statement where he saw baggies with cocaine – with white powder in the storage lockers. Okay. You can serve that on the clerk or file it after argument. Thank you. Okay. Thank you. The case of United States v. Arnold Flowers is submitted, and the Court is adjourned for this session.
judges: Ikuta, Christen, Freudenthal